438 S.E.2d 876

**Georgia BOARMAN, Plaintiff Below, Appellee,**

v.

**Raymond T. BOARMAN, Defendant Below, Appellant,**

**Department of Health and Human Resources, Intervenor.**

No. 21814.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 5, 1993.

Decided Dec. 15, 1993.

Gilbert Wilkes, III, Martinsburg, for appellee.

Cinda L. Scales, Steven M. Askin, Askin, Burke and Schultz, Martinsburg, for appellant.

Thomas M. Woodward, Deputy Atty. Gen., Charleston, for Department of Health and Human Resources.

WORKMAN, Chief Justice:

This is an appeal by Raymond Lee Boarman from an October 16, 1992, final order of the Circuit Court of Berkeley County granting custody of six of the parties' seven children to the Appellee and former wife of the Appellant, Georgia Boarman. The Appellant contends that the lower court erred in awarding custody to the children's mother and requests this Court to reverse the decision of the lower court. Finding that insufficient evidence has been gathered in this egregious custody matter, we remand this for additional proceedings consistent with this opinion.

## I.

While no custody dispute can properly be classified as normal or ordinary, the present case is one of the most troublesome custody matters we have recently encountered. The Appellee filed a divorce complaint on January 29, 1990, in the Circuit Court of Berkeley County, and the Appellant's answer was filed on February 20, 1990. Both parties sought custody of the seven children born of the marriage, namely Raymond Boarman (December 27, 1978), Brix Boarman (October 27, 1980), Betty Boarman (November 4, 1981), Reinhold Boarman (November 15, 1982), Reich Boarman (November 22, 1983), Misty Boarman (November 18, 1986), and Charles Boarman (November 15, 1989).

The parties were granted a divorce on December 7, 1990, and the temporary custody issue was addressed on December 11, 1990. At that hearing, the family law master

interviewed the two oldest children, Raymond (age 11) and Brix (age 10), in order to ascertain their custody preferences. The Appellant now complains that the family law master failed to administer any oath to the boys and failed to instruct them as to the importance of telling the truth. The boys informed the family law master that they desired to live with their mother. They further related incidents involving the father's alleged threats to the children and the father's shooting of cats at a family barbecue. Although Brix admitted that his mother had suggested that he use the term "supervised visitation" during the interview when referring to the type of visitation he desired with his father, the family law master apparently failed to inquire further into possible rehearsal or preparation of the boys for this interview. Based upon this interview with the two children, the family law master granted temporary custody to the mother with visitation to the father.

A final custody hearing was held on August 29, 1991, and the mother was determined to be the primary caretaker. The evidence adduced at this hearing was extensive and included testimony of the parents, babysitters, family members, neighbors, school personnel, and teachers. Witnesses for the father testified that the mother frequently verbally abuses the children, calling them various names. She later admitted to using the term asshole, but denied use of any other degrading language in reference to the children. Mr. and Mrs. Robert Palczynski, neighbors of the mother in New York, testified that the mother verbally abused the children, did not provide adequate clothing for the children in the winter months, and allowed them to catch mice and place them in the microwave until they exploded. The twelve-year-old son of the Palczynskis testified that he had played with the Boarman children and had been threatened by their mother. He had witnessed the placement of

the mice in the microwave, and he further testified that the children were permitted to play with knives and sticks and were permitted to watch pornographic films. He had personally witnessed an incident in which the children had observed their mother in bed with a man.[1]

Evidence by the father's witnesses also included allegations that the mother failed to cook properly for the children, failed to clean the living quarters, allowed the children to use profanity, failed to remove feces from the children when changing diapers, drank straight whiskey in the morning hours while caring for the children, and had sexual relations in the presence of the children.

The witnesses for the mother testified that the father conveyed social and political ideas to his children which included the belief that Jews and Negroes should be killed and that Adolph Hitler's political principles were laudable.[2] Testimony for the mother also included allegations that the father shot at cows in an attempt to change their direction and that he loses his temper easily and threatens to physically harm the children. The father denied shooting at cows but admitted that he had shot at cats because he thought they might have rabies. However, he denied having shot cats which were his children's pets.

Several witnesses for the mother also testified that her habits in her new location in New York were excellent and that she was an outstanding example of a single parent. A school psychologist from the children's school in New York testified that the mother was very cooperative and responsive to the needs of the children. The mother admitted that she had a drinking problem in the past, but assured the court that it had been corrected. She further admitted that the oldest boy preferred to live with his father.

The family law master then examined the oldest child of the parties. He testified that

---

1. It should be noted that Georgia Boarman alleged that her former husband had paid the Palczynskis for their negative testimony against her. When questioned regarding that allegation, Mr. Boarman explained that he had provided them with travel money to drive from New York to Martinsburg, West Virginia, but had not otherwise compensated them for their testimony.

2. The father later explained that he thought Adolph Hitler had some good ideas and some bad ones and explained that Hitler's ideas were good from a military standpoint.

the mother's house in New York was not nice and that he had previously testified to things that were untrue. He further stated that his mother had paid the children for being good in court, and that his mother would frequently keep him home from school to babysit the other children.

Based upon the testimony at the final custody hearing, the family law master recommended that the mother be awarded custody of the six youngest children and the father be awarded custody of the oldest child. Each party contended that the other party was unfit for custody. On October 16, 1992, the Circuit Court of Berkeley County entered the final custody order, approving the findings of the family law master without further hearing.

## II.

Upon appeal to this Court, it appeared that these serious allegations of abuse and neglect had never been examined, and we consequently ordered home studies of both the mother's home in New York and the father's home in West Virginia. A report on the father's home was filed with this Court on September 30, 1993, and a report on the mother's home was filed on October 1, 1993.[3] The home study conducted on the father's home indicated that the Appellant, age 61, is employed by General Motors. Raymond Boarman, currently in the ninth grade at Hedgesville High School, has been residing with his father since April 1992. The report indicated that the Appellant seemed open and honest and resided in a two-story farm house in a rural area of the county. The home appeared to be in good repair and the housekeeping standards were deemed acceptable. The social service worker concluded that the Appellant seemed to have adequate financial resources, housing, and space to provide for the needs of all seven children. The worker recognized that due to the seriousness of the accusations against the Appel-

lant with regard to his care of the children, the primary concern should be for the emotional well-being of the children. Psychological evaluations were recommended.

The home study performed on the mother's home in New York indicated that the Appellee was very cooperative and appeared open and honest. The Appellee was not working at the time of the study, but she apparently indicated that she hoped to find work within a few weeks. The family is presently living on food stamps and Medicaid assistance. Although the Appellant apparently owes child support, the Appellee indicated that she was not receiving any payments. The social service worker concluded that the Appellee was an extremely well-motivated single parent. Other individuals interviewed by the worker described the Appellee as very involved with the children, able to effectively deal with problems the children might encounter, nurturing, and caring. The final recommendation was that the children presently in their mother's care remain with her.

On September 30, 1993, prior to its receipt of the home study of the mother's home, the West Virginia Department of Health and Human Resources ("the Department"), as an intervenor party to this action,[4] recommended that this case be remanded to the family law master for further proceedings, that the Department continue to remain a party to the action, that the children be appointed a guardian ad litem, that a psychological evaluation be performed on both parents and the children, and that the lower court make a finding as to each significant allegation that would impact the welfare of the children. Upon review of this matter, we agree with the Department's conclusions and remand this matter for initiation of orders and proceedings outlined above.

With regard to our request for intervention of the department, we remind the circuit

3. Amazingly, both the home study conducted by the West Virginia Department of Health and Human Resources on the father in Martinsburg and the study conducted by the Broome County Department of Social Services on the mother in New York characterize these parents in almost glowing terms.

4. We note that the West Virginia Department of Health and Human Resources was directed by this Court to intervene in this matter.

courts and family law masters that Rule 34(b) of the West Virginia Rules of Practice and Procedure for Family Law (effective October 1993) provides that where there have been allegations of abuse or neglect, "the family law master or circuit judge may, sua sponte or on motion of either party, order an investigation or home study of one or both of the parties." Further, Rule 34(b) provides that "[w]hen a family law master or circuit judge finds that a child has been neglected or abused, the family law master or circuit judge shall report the abuse in accordance with the provisions of chapter 49, article 6A, section 2 of the Code of West Virginia."

■ Where serious allegations of abuse or neglect are made in a child custody case, the family law master and circuit judge should direct the department to intervene and conduct home studies and the court should make full inquiry into these allegations. Furthermore, when serious allegations of abuse or neglect arise, the protections afforded children under abuse and neglect law should apply.

■ The Appellant's primary assignments of error related to his contention that the Appellee was unfit to gain custody of the children. Obviously, due to our decision to remand, that issue need not be addressed at this juncture. With regard to his contention that the lower court erred by examining the two older children in camera during the temporary custody hearing without administering an oath, we find no merit to the position of the Appellant. First, the Appellant would have great difficulty convincing this Court that any irregularity in the administration of oaths or the lack of oaths at the temporary hearing prejudiced his rights in any manner. Moreover, the family law master's decision to grant temporary custody to the mother, while based in large part on the testimony of which the Appellant now complains, was not even the final decision regarding custody. Under these circumstances, we find no error in the failure of the family law master to administer an oath to the children.

■ We remain deeply concerned that something here is awry. We cannot abandon the question of these children's well-being

without further inquiry into this situation. We have previously recognized the following:

> Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security. Consequently, in order to assure that all entities are actively pursuing the goals of the child abuse and neglect statutes, the Administrative Director of this Court is hereby directed to work with the clerks of the circuit court to develop systems to monitor the status and progress of child neglect and abuse cases in the courts.

Syl. Pt. 1, *In re Carlita B.*, 185 W.Va. 613, 615, 408 S.E.2d 365, 367 (1991). In syllabus point 4 of *Carlita*, we explained the following:

> In formulating the improvement period and family case plans, courts and social services workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

*Id.* at 616, 408 S.E.2d at 368.

■ Finally, in syllabus point 5 of *Carlita*, we stated:

> The clear import of the statute [West Virginia Code § 49–6–2(d)] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible.

*Id.*

■ This matter will be remanded for further proceedings consistent with the recommendations of the Department, with the assistance of the Department continuing until resolution of this matter is accomplished. Furthermore, we direct the Department to expedite this case which has already lan-

guished too long in the judicial and social service systems to the detriment of the children involved.[5] Similarly, we instruct the circuit court that these allegations of neglect and abuse must be examined and resolved. On remand, the circuit court should appoint a guardian ad litem for the children and develop an expeditious schedule for ensuing proceedings. At the conclusion of the proceedings, which should be no more than six months, the circuit court shall file its findings of fact and conclusions of law with this Court, and we will undertake further consideration of this appeal at that time.

Remanded for further proceedings.

---

5. We note that on oral argument of this matter, counsel for the Department appeared less than adequately briefed on the status of this case. While it may be unfair to blame the particular lawyer involved, who maintained that the file had been handed to her only a few days before the hearing, we cannot tolerate such a dilatory effort on the part of the Department as a whole. We reemphasize to the Department that they must meet their responsibilities in such matters in a thorough and expeditious manner.